# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
June 16, 2022

Lyle W. Cayce
Clerk

No. 20-60913

Attala County, Mississippi Branch of the NAACP;
Antonio Riley; Sharon N. Young; Charles Hampton;
Ruth Robbins,

*Plaintiffs—Appellants*,

*versus*

Doug Evans, *in his official capacity as* District Attorney of the
Fifth Circuit Court District of Mississippi,

*Defendant—Appellee*.

Appeal from the United States District Court
for the Northern District of Mississippi
USDC No. 4:19-CV-167

Before Elrod, Southwick, and Costa, *Circuit Judges*.
Leslie H. Southwick, *Circuit Judge*:

A county chapter of the NAACP and four individual Plaintiffs brought suit against the district attorney for the Mississippi counties in which they live, claiming he regularly discriminates against black potential jurors by striking them from juries because of their race. The Plaintiffs asserted violations of their own constitutional rights to serve on juries. The district court determined that it should apply one of the Supreme Court's abstention

doctrines and dismissed the case. We do not analyze abstention and instead conclude that the Plaintiffs do not have standing. We AFFIRM.

FACTUAL AND PROCEDURAL BACKGROUND

The Mississippi Fifth Circuit Court District covers seven counties, including Attala County, in the north central region of the state. The District Attorney for that district is Doug Evans, who, according to the complaint, has held the office since 1992. In November 2019, this suit began with the filing of a complaint in the United States District Court for the Northern District of Mississippi against Evans in his official capacity as District Attorney.

The organizational Plaintiff is the chapter of the NAACP in Attala County. It brought suit "on behalf of its members, who are Black citizens of Attala County, are qualified for jury service in Circuit Court, and are subject to Evans' policy, custom, or usage of racial discrimination in jury selection." The four individual Plaintiffs are African-Americans who reside in the state's Fifth Circuit Court District and are eligible for jury service.

Suit was brought under 42 U.S.C. § 1983 for an alleged violation of their Fourteenth Amendment rights of prospective jurors. The complaint refers to news reports of an investigation by a group of journalists into criminal trials in the state's Fifth Circuit District. The data the journalists compiled allegedly supports that Evans and his office strike jurors due to their race. The complaint also specifically refers to the multiple trials of Curtis Flowers for murder, which generated claims that Evans and his office were improperly striking black jurors. We detail those.

Flowers's first conviction was reversed for "numerous instances of prosecutorial misconduct" at trial, though not misconduct in jury selection. *Flowers v. State*, 773 So. 2d 309, 327 (Miss. 2000). Flowers was again convicted after a second trial, and there too the Mississippi Supreme Court

reversed. *Flowers v. State*, 842 So. 2d 531, 564–65 (Miss. 2003). The court described instances of prosecutorial misconduct and admonished the state to give Flowers a fair trial instead of engaging "in tactics which mirror 'prosecution overkill.'" *Id.* at 564. The conviction that followed a third trial was reversed because of the prosecutor's actions in jury selection: the appeal "present[ed] [the court] with as strong a *prima facie* case of racial discrimination as [it had] ever seen in the context of a *Batson* challenge." *Flowers v. State*, 947 So. 2d 910, 935 (Miss. 2007) (referring to *Batson v. Kentucky*, 476 U.S. 79 (1986)). The fourth and fifth trials ended with mistrials. *See Flowers v. Mississippi*, 139 S. Ct. 2228, 2237 (2019). The sixth trial resulted in a conviction, but the United States Supreme Court reversed. *Id.* at 2251. The Court stated that in each of the first four trials, prosecutors "appeared to proceed as if *Batson* had never been decided. The State's relentless, determined effort to rid the jury of black individuals" in the first four trials, and the striking of five of six black jurors in the sixth trial, required reversal. *Id.* at 2246, 2251.

According to the Plaintiffs' brief, Evans then requested that the state circuit judge who had presided over the latest trial contact the Mississippi Attorney General to determine if she would agree to have her office accept the case. *See* Miss. Code. Ann. § 7-5-53. Contact was made; the Attorney General took the case, and, after review, that office moved to dismiss all charges. The state circuit court granted the motion in September 2020.

Plaintiffs sought a declaratory judgment that Evans's practices violated the constitutional rights of prospective jurors such as themselves. They also sought an injunction preventing Evans from continuing in these alleged practices, and attorneys' fees under 42 U.S.C. § 1988. They did not seek damages.

No. 20-60913

Evans moved to dismiss on the basis that Plaintiffs lacked standing, that the claims were not ripe, and that the court should abstain. The district court did not discuss standing or ripeness, but it held that abstention was compelled by the Supreme Court's decision in *O'Shea v. Littleton*, 414 U.S. 488 (1974). It therefore dismissed the suit. The Plaintiffs timely appealed.

## DISCUSSION

The Plaintiffs' opening brief in this court understandably focused on the sole basis of the district court's ruling, which was that abstention was appropriate. Evans's responsive brief defended that ruling but also argued in the alternative that a lack of standing, which it also had urged in its motion to dismiss, was independently available as a basis to dismiss. In reply, the Plaintiffs presented significant argument as to why they had standing.

A district court's judgment can be affirmed on any basis, even one not reached by the court, that is supported by the record. *Lindsey v. Bio-Medical Applications of La., L.L.C.*, 9 F.4th 317, 327 (5th Cir. 2021). We will use that authority to consider the question of standing and, since it supports affirmance, will not reach the issue of abstention.[1]

It is axiomatic that a plaintiff seeking redress in federal court must meet the initial "requirement imposed by Article III of the Constitution by alleging an actual case or controversy." *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983). One aspect of the case-or-controversy requirement is that a plaintiff must establish standing to sue. *Clapper v. Amnesty Int'l USA*, 568

---

[1] Our reluctance to analyze abstention arises in part from the fact that our research does not reveal any Supreme Court or Fifth Circuit opinions in which abstention as analyzed in *Younger* or *Littleton* applied when the plaintiffs had not been parties to state-court proceedings, nor could they be in the future. Past and prospective jurors are essential to the criminal proceedings, but they are not parties. The distinction may not make a difference, but no analysis is needed today.

No. 20-60913

U.S. 398, 408 (2013). To establish standing, each plaintiff must demonstrate an injury that is "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010). In analyzing whether a plaintiff has met these requirements, federal courts are skeptical of "standing theories that require guesswork as to how independent decisionmakers will exercise their judgment." *Clapper*, 568 U.S. at 413.

The type of relief sought also bears on whether the plaintiff has standing. *See Lyons*, 461 U.S. at 103. To prevail on a claim for prospective equitable relief, a plaintiff must demonstrate continuing harm or a "real and immediate threat of repeated injury in the future." *Society of Separationists, Inc. v. Herman*, 959 F.2d 1283, 1285 (5th Cir. 1992). The threat of future harm must be "certainly impending"; mere "[a]llegations of possible future injury" do not suffice. *Clapper*, 568 U.S. at 409 (alteration in original; emphasis removed; quotation marks and citations omitted). Past wrongs are relevant to "whether there is a real and immediate threat of repeated injury," but alone they may be insufficient to establish standing for prospective relief. *Littleton*, 414 U.S. at 496. Somewhat different phrasing is also used in other judicial opinions, namely, that there "must be at least a 'substantial risk' that the injury will occur." *Crawford v. Hinds Cnty. Bd. of Supervisors*, 1 F.4th 371, 375 (5th Cir. 2021) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)). We see no necessary difference between the concepts of a substantial risk and a real and immediate threat, though immediacy does imply a short timeframe.

The Plaintiffs allege that their injury is the imminent threat that Evans will deny them an opportunity for jury service by excluding them because of their race. The Fourteenth Amendment protects the right of a citizen not to be excluded from a petit jury because of his or her race. *See Powers v. Ohio*, 499 U.S. 400, 409 (1991). A juror who alleges being struck from a jury

5

because of race has alleged a cognizable injury for purposes of Article III standing. *See id.* at 411. The Supreme Court, though, has recognized the practical difficulties and "daunting" barriers facing an excluded juror seeking forward-looking relief against a prosecutor. *Id.* at 414. Unlike juror challenges to discriminatory practices by jury clerks and commissioners who tainted entire jury rolls with racial bias, the Court noted that it would be more difficult "for an individual juror to show a likelihood that discrimination against him at the *voir dire* stage will recur." *Id.* at 415.

The difficulty for the Plaintiffs is showing a likelihood or imminence of the alleged future injury. Injury would require that a Plaintiff one day is called for jury service in a case assigned to Evans's office; the prosecutor seeks to remove the person from the jury due to race; an independent decision-maker — namely a trial judge who reviews a *Batson* challenge — then fails to block the use of the discriminatory strike. *See Clapper*, 568 U.S. at 412–13. Yes, those events have happened to others, but we find that the Plaintiffs have not demonstrated a "real and immediate threat" or a "substantial risk" that all those events will occur to one of them. *See Society of Separationists,* 959 F.2d at 1285; *Crawford*, 1 F.4th at 371. We explain.

Save one, none of the Plaintiffs have ever been struck from a jury by Evans. Indeed, they have not even been called to jury service. Only Sharon Young (formerly Sharon Golden) was part of a venire in Evan's district. She had stated during *voir dire* that she could not vote for the death penalty in one of the Curtis Flowers trials, and the state Supreme Court upheld striking her from the jury. *See Flowers*, 947 So. 2d at 919–21. It is proper for a prosecutor in a capital case to strike a member of the venire for cause if the prospective juror indicates a refusal to consider the death penalty. *Uttecht v. Brown*, 551 U.S. 1, 8–9 (2007) (applying *Witherspoon v. Illinois*, 391 U.S. 510 (1968)). At least on its face, then, the strike of the one Plaintiff who has previously been called for jury duty was not unconstitutional.

No. 20-60913

The Plaintiffs analyze their injuries to those of a group of contractors who sued a city that had adopted a contract set-aside program for minority-owned businesses. *See Northeast Fla. Chap. of the Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 659 (1993). The Supreme Court disagreed with the Eleventh Circuit's decision that the contractors lacked standing, instead concluding that the contractors "need only demonstrate that it is able and ready to bid on contracts and that a discriminatory policy prevents it from doing so on an equal basis." *Id.* at 666. The Court noted that the "injury in fact" in an equal protection case of this variety "is the inability to compete on an equal footing in the bidding process, not the loss of a contract." *Id.* The current Plaintiffs are unlike the contractors inasmuch as these Plaintiffs have no right to initiate their participation in the competition for the desired benefit. If called, though, they have a "right not to be excluded from [a jury] on account of race." *Powers*, 499 U.S. at 409. The Plaintiffs' need to show imminence of injury remains.

The Plaintiffs also compare their claim to those in certain cases in which plaintiffs were permitted to pursue claims of jury discrimination. The three cited cases alleged discrimination by officials charged with administering a state's petit or grand jury *rolls* at a point well before any court proceedings took place, thus affecting the selection of the entire citizenry for jury or grand jury duty. *See Carter v. Jury Comm'n of Greene Cnty.*, 396 U.S. 320, 322 (1970); *Turner v. Fouche*, 396 U.S. 346, 360 (1970); *Ciudadanos Unidos de San Juan v. Hidalgo Cnty. Grand Jury Comm'rs*, 622 F.2d 807, 811–12 (5th Cir. 1980). The distinction between being kept off a jury roll and being struck improperly at trial matters in deciding whether a plaintiff has demonstrated a likelihood of injury. If certain categories of individuals are made ineligible from being jurors even before a trial begins, then nothing more needs to be demonstrated to show they will not be selected as jurors.

7

Quite different is the needed demonstration of injury for a Plaintiff who could in fact be called for jury service; we have already outlined the combination of events that must occur before there would be an injury.

Similarly, a panel of the Eleventh Circuit held that discrimination by officials controlling a locality's entire jury roll is readily distinguishable from the behavior of a single state official exercising a handful of peremptory strikes during a trial. *See Hall v. Valeska*, 509 F. App'x 834, 836 (11th Cir. 2012). It is true that the Eleventh Circuit relied on the analysis of abstention in *Littleton* to support its ruling. *Id.* (discussing *Littleton*, 414 U.S. 488). Nonetheless, the same logic applies to our focus on standing.

We contrast the case before us with our recent decision in *Crawford*, 1 F.4th 371. There, the disabled plaintiff Crawford had twice been called for jury service at the county courthouse; he had faced serious "architectural barriers" while attempting to serve. *Id.* at 374. He sued the county for injunctive relief, arguing that the courthouse violated the Americans with Disabilities Act. *Id.* The district court, though, held he lacked standing. *Id.* On appeal, we framed the key issue as "whether the possibility that Crawford will be called for and excluded from jury service in the future is too speculative to support standing for injunctive relief." *Id.* at 374–75. In concluding that he had standing, this court reasoned that (1) Crawford had already been called for jury duty twice before, a fact that the court repeatedly emphasized; (2) the county was relatively small so he might be called again; and (3) the "architectural barriers" amounted to a "systemic exclusion" rather than an "episodic" threat because they would manifest *every* time he was considered for jury duty. *See id.* at 376.

In summary, Crawford had already been called twice for jury duty, and if called again, the physical barrier — the courthouse — that impeded his ability to serve as a juror was literally set in concrete. The inevitability of that

No. 20-60913

barrier is akin to being left off the jury rolls completely. The likelihood of difficulties for the Plaintiffs in the current case are much less imminent. We start with the infrequency of any Plaintiff being called for jury duty. Then, if called, the Defendant Evans and his office would need to be unchastened by the reversals by the United States Supreme Court as well as by the Mississippi courts. Then, if a discriminatory strike were nonetheless made against one of these Plaintiffs, the presiding state trial judge would need to uphold it. We simply do not see a sufficient threat of a constitutional injury.

We separately consider standing for the Attala County NAACP. The association can assert its members rights only if (1) its members could sue individually; (2) the interests in the suit are "germane to the organization's purpose"; and (3) the claim and relief sought do not require the "participation of individual members in the lawsuit." *Texas Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 377 (5th Cir. 2021) (quotation marks and citations omitted). As we have already analyzed as to the four individual Plaintiffs, eligibility for jury service is not enough. The members of the county chapter cannot demonstrate an imminent threat that they will be struck unconstitutionally from a petit jury by Evans.

Our decision is unrelated to the plausibility of the allegations about jury selection in the state circuit court district. The claims' gravity is supported not only by the journalists' investigation referenced in the record but also by court decisions that the district attorney committed *Batson* violations in trials of Curtis Flowers. We hold only that these Plaintiffs have not alleged a certainly impending threat or a substantial risk to their rights that would satisfy the requirements of Article III.

AFFIRMED.

9

No. 20-60913

Gregg Costa, *Circuit Judge*, dissenting:

The percentage of citizens who show up for jury duty is staggeringly low. *See* Andrew Tilghman, *Is There Justice if Most Who Show Up for Jury Duty Are White, Affluent?*, Hous. Chron., Mar. 6, 2005 (revealing that only 17% of Houston-area jurors appear for service and noting that the ten zip codes with the lowest turnout—all below 10%—are predominately Black or Hispanic). The citizens bringing this lawsuit are a refreshing departure from those statistics—they are eager to do their civic duty. Yet today's opinion holds that federal courts cannot hear their challenge to the discrimination that prevents them from participating equally in our justice system. It does so because plaintiffs only have standing to sue for a future injury if they show that harm is imminent. Imminence, however, is a question of probability. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 n.2 (1992) (describing imminence as an "elastic concept" that requires speculation); Wright & Miller, Federal Practice & Procedure § 3531.4 (collecting cases of standing based on "probable" and "possible" injury). And these Americans seeking to perform their civic duty are just as likely—and actually more likely—to be called for jury duty in the near future than plaintiffs in other cases we have allowed prospective jurors to pursue. Our precedent thus dictates that they have standing to challenge District Attorney Evans's longstanding discrimination against Black prospective jurors.

First, consider a case from just last year holding that a plaintiff showed the necessary likelihood of being called for jury duty. We affirmed a disabled potential juror's standing to challenge the inaccessibility of his local courthouse. *See Crawford v. Hinds Cnty. Bd. of Supervisors*, 1 F.4th 371, 373–77 (5th Cir. 2021). Standing turned on whether the juror established a "substantial risk of being called for jury duty" and being dismissed because the courthouse could not accommodate his wheelchair. *Id.* at 376. We found

that sufficient probability because of the small size of the county and because the plaintiff had been summoned twice before. *Id.* at 366.

Both considerations—size of the jury pool and history of being called—make it more likely that the present Plaintiffs will be summoned than the *Crawford* plaintiff. The *Crawford* jury pool was Hinds County, which we described as "not extremely populous."[1]  1 F.4th at 376.  In fact, Hinds is Mississippi's largest county, with a population exceeding 220,000.  If a county of that size is "not extremely populous," then Attala County, which has a population one tenth of Hinds's, is practically a ghost town.  And unlike in *Crawford*, we do not have to guess about the probability of the Plaintiffs being called for jury duty.  The complaint provides details, absent from our prior cases, about that likelihood.  Attala County is home to approximately 9,660 eligible jurors, 1,650 of whom are summoned annually.  That is a roughly 1-in-6 chance of being called in any given year.  And the fact that the named Plaintiffs have not been called recently increases those odds.  Mississippians cannot serve on a jury if they have done so in the past two years.  MISS. CODE ANN. § 13-5-1.  By any statistical measure, then, an Attala County plaintiff in this case is more likely to be called for jury service in the near future than was Crawford.

Citizens of Attala County are also more likely to be summoned for jury service than the plaintiffs in decades of precedents allowing prospective jurors to challenge discriminatory jury practices.  Attala County is much smaller than Travis County, home to Austin and the plaintiff who

---

[1] Though our precedent assumes that jurors in small counties are necessarily more likely to be called than those in larger counties, I am not convinced.  Larger counties have more trials.  So the more relevant metric is the number of people summoned each year as a percentage of the county's eligible jurors.  This case is exceptional in providing that data.  But if we consider only the size of the county—as our precedents seem to do—the Plaintiffs' case for standing is a slam dunk.

successfully challenged Texas's ban on atheists serving on juries. *See O'Hair v. White*, 675 F.2d 680, 684, 691 (5th Cir. 1982) (en banc). And petit jury service is much more common than grand jury service, yet both our court and the Supreme Court have allowed plaintiffs to challenge discrimination in the selection of grand jurors. *Turner v. Fouche*, 396 U.S. 346, 349–50, 360 (1970) (reaching the merits of Black citizens' claim that Georgia's system for selecting grand jurors discriminated on the basis of race); *Ciudadanos Unidos De San Juan v. Hidalgo Cnty. Grand Jury Com'rs*, 622 F.2d 807, 817–18, 821 (5th Cir. 1980) (allowing young, Mexican American, and impoverished jurors to contest their systemic exclusion from grand juries in two Rio Grande Valley counties); *see also Carter v. Jury Comm'n of Greene Cnty.*, 396 U.S. 320, 321–22, 339–40 (1970) (permitting Black citizens to challenge their discriminatory exclusion from both grand and petit juries).[2]

Probability and precedent thus show that there is a substantial risk that these Plaintiffs will be called for jury duty.

Mountainous evidence also shows that Plaintiffs, once summoned, face a "systemic" threat of being excluded from jury service because of their race. *See Crawford*, 1 F.4th at 376 ("[A] plaintiff with a substantial risk of being called for jury duty has standing to seek an injunction against a systemic exclusionary practice."). District Attorney Evans's discriminatory jury-selection practices are notorious. The Supreme Court recently considered Evans's conduct in his repeated prosecutions of Curtis Flowers, a Black man accused of murdering four people in a Winona, Mississippi furniture store.

---

[2] Only once before have we denied a prospective petit or grand juror standing. In that case, injury depended not only on the plaintiff being called for jury duty, but also being selected as part of the venire before a specific judge in an urban county with many judges. *Soc'y of Separationists, Inc. v. Herman*, 959 F.2d 1283, 1285 (5th Cir. 1992) (en banc). That additional requirement, which is not present here, made future injury too speculative to support standing. *Id.* at 1285–86.

*Flowers v. Mississippi*, 139 S. Ct. 2228, 2236–38 (2019). Evans prosecuted Flowers for the murders six times, and each time, a court overturned Flowers's conviction due to Evans's discrimination and other misconduct. *Id.* In reversing Flowers's sixth conviction, the Supreme Court chastised Evans for his "pattern of striking Black prospective jurors." *Id.* at 2251. In fact, Evans struck 41 of 42 Black prospective jurors across Flowers's six trials. *Id.* at 2251. "The numbers speak loudly." *Id.* at 2245. So loudly that we do not have to speculate about whether Evans will continue to try to seat only white jurors—his history speaks for itself. *See id.* at 2246.

Plaintiffs' complaint nonetheless adds to the high court's indictment of Evans's conduct. Statistical analysis from over two hundred prosecutions between 1992 and 2017 reveals that Evans's office struck Black jurors at 4.4 times the rate it struck white jurors.[3] A regression analysis of a subset of those trials, which isolates race among more than sixty variables, is even more damning: "a Black juror faced odds of being struck that were 6.67 times those faced by similarly situated white jurors." *Contrast Soc'y of Separationists*, 959 F.2d at 1286 (concluding that juror did not establish a likelihood of being discriminated against because the allegedly improper conduct was a one-off incident and not the product of "any state or local rule or statute, or even some personal policy"). The majority speculates that *Flowers* might chasten Evans into changing his ways. Maj. Op. 9. But, as Plaintiffs allege, Evans's own words dispel this optimism. Rather than accepting responsibility for his past discrimination, Evans called *Flowers* a "ridiculous ruling." Amanda Sexton Ferguson, *Flowers Case Sent Back to Circuit Court*, Winona Times

---

[3] Evans's office tried 418 criminal cases in this time period. The analysis considered all 225 trials for which juror race data was available.

No. 20-60913

(Sept. 5. 2019).  Plaintiffs have shown that they face an ongoing threat of being excluded from the jury for no reason other than the color of their skin.

Once again, the grand jury cases support these Plaintiffs' standing. The majority seems to view those cases as challenges to laws that categorically excluded certain groups of citizens from the grand jury rolls. Maj. Op. 7-8.  But those cases, like this one, stemmed from officials' repeatedly exercising their discretion in a discriminatory manner. *See Ciudadanos Unidos*, 622 F.2d at 811 (noting that the jury rolls excluded minorities because selection was "left entirely to the discretion of the jury commissioners"); *Turner*, 396 U.S. at 351 (describing jury commissioners' freedom to exclude anyone they felt would not be good jurors from the rolls). At any moment, the commissioners could have changed their minds and started adding to the grand jury rolls citizens from the previously excluded groups.[4]  But given the pattern of discrimination, that possibility did not destroy standing.  It should not matter whether discrimination occurs before or after a juror arrives at the courthouse: Plaintiffs who have shown that officials predictably use their discretion to discriminate have standing to challenge that discriminatory practice.[5]  To hold otherwise is especially problematic because of the history of cloaking discrimination in the "discretion" of local officials. *See* Michael J. Klarman, From Jim Crow to Civil Rights: The Supreme Court and the

---

[4] In fact, by the time *Turner* reached the Supreme Court, eleven Black jurors had been included on the grand jury list in Taliaferro County, Georgia. *Turner*, 396 U.S. at 351.

[5] The majority cites *Hall v. Valeska*, 509 F. App'x 834, 836 (11th Cir. 2012) (per curiam), as support for distinguishing between discrimination that occurs before trial and discrimination that occurs during trial.  That case involved a similar allegation that a District Attorney pervasively struck Black jurors because of their race. *Id*. at 935.  It is telling, however, that neither the district court nor the appellate court ruled that the *Hall* challengers failed to clear the jurisdictional hurdle of standing. *See id. ; Hall v. Valeska*, 849 F. Supp. 2d 1332, 1336 n.3 (M.D. Ala. 2012).

No. 20-60913

STRUGGLE FOR RACIAL EQUALITY 34–36, 85–86 (2004) (recounting how voting laws granting registrars wide discretion to determine eligibility were a cornerstone of disenfranchisement during Jim Crow); *see also, e.g.*, *Lassiter v. Northampton Cnty. Bd. of Elecs.*, 360 U.S. 45, 53 (1959) (holding that Alabama's literacy test, which vested "great discretion" in local registrars, was facially unconstitutional because it was "merely a device to make racial discrimination easy").

The Plaintiffs provided ample evidence of their substantial risk of being summoned and subjected to Evans's discriminatory jury selection practices. It is hard to imagine what more they could have offered to prove an impending injury. If standing is lacking here despite more data on the likelihood of being summoned and then discriminated against than in past cases allowing prospective jurors' standing, then I fear citizens will not be able to file lawsuits challenging racial or other barriers to jury service. Abandoning this type of civil rights suit that historically has allowed excluded jurors to participate in our justice system impairs the jury right itself.

Jurors are the voice of We The People in the otherwise-insulated judiciary. And in a large country where many citizens feel detached from their leaders in the political branches—members of the House of Representatives today represent about 750,000 people—jury service increasingly is citizens' greatest bond with our democracy. *See Flowers*, 139 S. Ct. at 2238 ("Other than voting, serving on a jury is the most substantial opportunity that most citizens have to participate in the democratic process."). Jury service also inculcates other civic virtues, like voting, volunteering, and discussing public issues with neighbors. JOHN GASTIL ET AL., THE JURY AND DEMOCRACY: HOW JURY DELIBERATION PROMOTES CIVIC ENGAGEMENT AND POLITICAL PARTICIPATION 10, 34–39, 106–128 (2010). Without standing to bring this lawsuit, Plaintiffs are left with little hope that they will have a fair chance at the "honor and

privilege" of fulfilling this vital civic duty. *See Powers v. Ohio*, 499 U.S. 400, 407 (1991).